DANNY CLINGAN, Ex'r of the Estate of Genevieve Clingan, Deceased, Plaintiff-Appellant, v. C.S. RAKALLA *et al.*, Defendants-Appellees.

Fourth District No. 4—93—0303

Argued October 13, 1993.—Opinion filed November 15, 1993.— Rehearing denied December 30, 1993.

William A. Young (argued), of Young & Young, and Frank R. Young, both of Danville, for appellant.

Everett L. Laury, of Hutton, Laury, Hesser, Lietz & Wilcox, of Danville, for appellee C.S. Rakalla.

Carroll W. Dukes and Christopher P. Meyer, both of Dukes, Martin, Helm & Ryan, Ltd., of Danville, for appellee Vermilion Healthcare Foundation, Inc.

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

In November 1992, a jury returned verdicts in a medical malpractice suit in favor of defendants, Dr. C.S. Rakalla and Lakeview Medical Center (Lakeview), whose successor in interest is Vermilion Healthcare Foundation, Inc.

Plaintiff, Danny Clingan, as executor of the estate of Genevieve Clingan, appeals, arguing that (1) the verdict in favor of Dr. Rakalla was against the manifest weight of the evidence; (2) the trial court erred in finding as a matter of law that the emergency room physician who treated the decedent was not an agent of Lakeview; (3) the verdict in favor of Lakeview was against the manifest weight of the evidence; and (4) the bailiff's improper conduct toward the jury during its deliberations requires a new trial.

We affirm in part, reverse in part, and remand for a new trial only as to Lakeview.

I. BACKGROUND

On February 26, 1987, the two daughters of Mrs. Genevieve Clingan, age 60, brought her to Dr. Rakalla's office in Covington, Indiana, for a 2 p.m. appointment scheduled that day. One of the daughters told the receptionist that Mrs. Clingan was too ill to get out of the car and come into the office. At approximately 2:30 p.m., Dr. Rakalla went to the parking lot and examined Mrs. Clingan in the back of her car. He was informed that she had been sick for the past few days, suffered from a severe headache, felt very weak, and had been vomiting. Dr. Rakalla conducted a limited examination by looking at her neck and eyes, checking her pulse, and listening to her heart. He refused Mrs. Clingan's repeated requests for an injection to ease the headache pain, noted that she was dehydrated, and recommended that the daughters take her to the hospital emergency room. According to Dr. Rakalla, one of the daughters told him that Mrs. Clingan did not want to go to the hospital. The daughter insisted that Dr. Rakalla give her mother a shot for pain. When Dr. Rakalla again refused, one of the daughters told him they would take their mother to Dr. Quianzon, who was a family friend. At trial, both daughters denied that they told Dr. Rakalla they would take their mother to Dr. Quianzon.

Dr. Rakalla returned to his office. A few minutes later, the daughters asked his office staff to call an ambulance. They complied, and an ambulance arrived in the parking lot and transferred Mrs. Clingan to Lakeview in Danville, Illinois. She arrived at approximately 3 p.m. Lakeview's admitting form indicated that a daughter had requested Dr. Quianzon be called. At 3:10 p.m., Lakeview called Dr. Quianzon, and he referred Mrs. Clingan to the care of the emergency room physician. At 3:11 p.m., Lakeview called Dr. Rakalla, and he also referred Mrs. Clingan to the care of the emergency room physician. Carol Harden, the emergency room nurse, testified that she first called Dr. Quianzon at the daughter's request, and then telephoned Dr. Rakalla. However, she stated that both physicians referred the patient's care to the emergency room physician.

Mrs. Clingan remained in the Lakeview emergency room from 3 p.m. until 8:40 p.m., when she was admitted to the hospital for a 23-hour observation. Her vital signs, taken at 3 p.m., were all within normal ranges. Dr. Birchall, the emergency room physician, examined her at 3:30 p.m. He examined her eyes for a variation in the size of her pupils and for swelling of the optic nerve. These tests indicated no abnormality in the pupils; they were round and reacted to light equally. Dr. Birchall also tested her for a stiff neck, unequal hand grips, and a positive Babinski sign, any of which might have been symptomatic of subarachnoid hemorrhage. He found none present. Intravenous medication began at 3:35 p.m., and Norflex, a muscle relaxer, was given at 4:05 p.m. Demerol, a narcotic pain reliever, was given at 5:05 p.m., and the hospital staff noted that the patient was sleeping at 5:26 p.m.

Dr. Birchall called Dr. Rakalla at 7:30 p.m., stating his intent to discharge Mrs. Clingan. In response, Dr. Rakalla suggested that she be admitted for observation. Dr. Rakalla also advised Dr. Birchall to contact Dr. Quianzon to inquire what he wanted to do, in view of the family's preference for Dr. Quianzon to be the treating physician. At 7:35 p.m., Dr. Birchall requested a hospital room for Mrs. Clingan, and she was transferred there at approximately 8:40 p.m.

About 9 p.m., the Lakeview floor nurse contacted Dr. Rakalla to advise him that Mrs. Clingan had been admitted under his care, had a temperature of 103 degrees, and her breathing was not good. He prescribed a catheter and antibiotics and stated that he would come directly to the hospital. As he was leaving for Lakeview, he received another phone call, informing him that Mrs. Clingan had experienced respiratory arrest. When he arrived at the hospital, she had a tube placed in her trachea, was receiving oxygen, and was unconscious. At

that point, he suspected she had meningitis and called in a neurologist and a cardiologist for a diagnosis of her condition.

The neurologist performed a lumbar puncture, revealing blood in the cerebrospinal fluid, and then ordered a CT scan. The CT scan showed a subarachnoid hemorrhage—bleeding into a space between the filmy tissue covering the brain and the brain—at the base of the patient's brain. In Mrs. Clingan's case, the hemorrhage resulted from an arterial/veinous malformation, a congenital abnormality of the blood vessels in the brain. Dr. Rakalla testified that, in hindsight, he thought Mrs. Clingan might have had a mild leakage of blood a day or two before she appeared at Lakeview, but the major bleeding from the subarachnoid hemorrhage occurred after she arrived at the hospital and around the time of the respiratory arrest.

At approximately 1:30 p.m. on February 27, 1987, Mrs. Clingan was transferred to the Burnham Trauma Center in Champaign, Illinois. Dr. Carl Belber, a neurosurgeon, performed an angiogram, which revealed a large blood clot at the brain stem blocking the flow of cerebrospinal fluid from the subarachnoid. Dr. Belber operated on Mrs. Clingan at approximately 8 p.m. that evening to remove the blood clot and relieve pressure on the brain. The next day he performed a second operation to insert a shunt to drain the cerebrospinal fluid. He performed a third surgery on April 7, 1987, to remove the shunt, which by then had become infected. Mrs. Clingan's condition deteriorated. She developed septicemia and other organ infections, which eventually resulted in renal failure and her death on April 21, 1987.

## II. ANALYSIS

### A. Plaintiff's Case Against Dr. Rakalla

Dr. Fermaglich and Dr. Cunningham testified as plaintiff's expert witnesses. Neither had any criticism of Dr. Rakalla's treatment of Mrs. Clingan in the parking lot of his office, including his referral of her for treatment to the emergency room at Lakeview. Both experts testified that common and accepted medical practice was to refer the care and treatment of a patient to the emergency room doctor. Both of defendants' experts, Dr. Pollard and Dr. Birchall, testified that when an emergency room referral is made, the emergency room physician at Lakeview has full authority and responsibility for the evaluation, examination, and treatment of the patient. Dr. Fermaglich criticized Dr. Rakalla for failing to order a CT scan while the patient was in the emergency room at Lakeview and for failing to diagnose her

condition. He was unaware, however, that the family had requested Dr. Quianzon to assume the care of Mrs. Clingan upon transfer to the emergency room, and he had not read Dr. Rakalla's deposition. Dr. Pollard testified that based on the brief contact in the parking lot, no basis existed to order a CT scan, and medical standards did not require Dr. Rakalla to go to the emergency room to participate in the care of the patient.

Neither of plaintiff's medical experts criticized the care Dr. Rakalla gave Mrs. Clingan after she had been admitted to her hospital room. Dr. Cunningham testified that any failure to order a CT scan was a criticism directed primarily against the emergency room physician, and he could not give an opinion whether anything Dr. Rakalla did or did not do caused the death of Mrs. Clingan.

Plaintiff's sole allegation of malpractice against Dr. Rakalla is that if he believed Mrs. Clingan had meningitis or viral infection, he should have reported that belief to the Lakeview emergency room at 3:11 p.m. when he talked to the nurse. Apparently, plaintiff bases this contention on Dr. Rakalla's testimony that when Dr. Birchall contacted him at 7:30 p.m., Dr. Rakalla recommended that she be admitted because he thought she was weak with viral symptoms or meningitis. However, the record contains no evidence that Mrs. Clingan in fact suffered from meningitis or viral infection, let alone that a failure to report this diagnosis proximately caused her death. Plaintiff presented no evidence that Dr. Rakalla had any responsibility to treat or diagnose Mrs. Clingan in the emergency room or had any responsibility for any acts or omissions by Dr. Birchall, the emergency room physician. Rather, the uncontradicted evidence established that Dr. Birchall had total responsibility for the care and treatment of Mrs. Clingan from the time she appeared at the emergency room at 3 p.m. until the time she was transferred to her room at 8:40 p.m.

■ In medical malpractice cases, the plaintiff carries the burden of showing (1) the proper standard of care against which the physician's conduct is to be measured, (2) the unskilled or negligent failure to comply with that standard, and (3) the resulting injury proximately caused by the lack of skill or care. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423, 328 N.E.2d 301, 304-05; *Saxton v. Toole* (1992), 240 Ill. App. 3d 204, 210, 608 N.E.2d 233, 238.) Plaintiff's proof failed on all of these elements, and the evidence so overwhelmingly supports the jury's verdict that no contrary verdict could ever be permitted to stand. The record is utterly devoid of any evidence of medical malpractice by Dr. Rakalla. Accordingly, we emphatically reject plaintiff's

argument that the verdict in favor of Dr. Rakalla was contrary to the manifest weight of the evidence.

## B. *Plaintiff's Case Against Lakeview*

■ The trial court instructed the jury that the emergency room physician, Dr. Birchall, was not an agent of Lakeview and Lakeview could not be held liable for any of his acts. The court did so based upon its express rejection of plaintiff's claim that Lakeview could be found vicariously liable for the alleged negligence of Dr. Birchall under the doctrine of apparent authority. The court accepted Lakeview's claim that Dr. Birchall was an independent contractor, not a hospital employee. However, the supreme court recently recognized the doctrine of apparent authority in the context of a suit for medical malpractice against a hospital. (*Gilbert v. Sycamore Municipal Hospital* (1993), 156 Ill. 2d 511, 523.) In view of that holding, we conclude that the jury instruction precluding a jury determination on the issue of whether Lakeview may be held vicariously liable for the acts or omissions of Dr. Birchall constitutes reversible error as a matter of law. Accordingly, we reverse the verdict entered in favor of Lakeview and remand for a new trial.

## C. *The Bailiff's Conduct During Jury Deliberations*

■ In order to provide guidance to the trial courts, we will comment on the irregularity which occurred during the jury's deliberations. At approximately 4:45 p.m., the jury foreman advised the bailiff that the jury had a question of law for the judge. Although the evidence is somewhat disputed, plaintiff claims that the bailiff told the foreman that the judge had left the courthouse. The foreman asked if he could speak with the judge by phone, and the bailiff then told the foreman that it would take 1½ hours to call the judge and to get the lawyers back to the courtroom. He advised them to solve their problem, and, if they could not, he would then contact the judge. After the foreman informed the jury of this conversation, the jury decided it was unnecessary to summon the judge. Shortly thereafter, the jury rendered a verdict in favor of both defendants.

These troubling problems of volunteered information between court personnel and the jury should not arise, and we caution trial courts to carefully instruct such personnel on their limited (but important) role. Bailiffs should serve merely as conduits for *any* exchange of communication between the court and a deliberating jury—they do not possess authority to impart information or give directions on their

own. A lack of adherence to this principle creates the real prospect of prejudicial error requiring reversal.

Plaintiff argues that these irregularities tainted the jury's verdict in favor of Dr. Rakalla. Had plaintiff's case been stronger, this argument might have merit. However, as we earlier held, plaintiff's case against Dr. Rakalla was so weak that no verdict in favor of plaintiff could ever be permitted to stand. Thus, we need not concern ourselves with problems that arose during the jury's deliberations.

### III. Conclusion

For the reasons stated, we affirm the verdict in favor of Dr. Rakalla, reverse the verdict in favor of Lakeview, and remand the cause for a new trial only as to Lakeview.

Affirmed in part; reversed in part and remanded.

KNECHT and LUND, JJ., concur.